**No. 69-CV-14430**
_____

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**
_____

UNITED STATES OF AMERICA

v.

SCHOOL BOARD OF CATAHOULA PARISH, ET AL.
_____

**BRIEF FOR *AMICUS CURIAE* LOUISIANA STATE CONFERENCE NAACP IN**
**SUPPORT OF APPOINTMENT OF A SPECIAL MASTER**
_____

LOUIS G. SCOTT
LAW OFFICE OF LOUIS G. SCOTT
510 Pine St.
Monroe, LA 71201
(318) 323-6107
grand97scott@aol.com

W. KYLE TAYMAN
JESSICA RABINOWITZ
VIONA J. MILLER
GOODWIN PROCTER LLP
901 New York Avenue
Washington, D.C. 20001
(202) 346-4000
ktayman@goodwinlaw.com
jrabinowitz@goodwinlaw.com
vmiller@goodwinlaw.com
*Pro hac vice applications pending*

Dated: March 15, 2019                          *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.    STATEMENT OF INTEREST OF THE AMICUS CURIAE ................................. 2

II.    FACTUAL AND PROCEDURAL BACKGROUND........................................ 4

   A.  Procedural History........................................................................................ 4

   B.  Catahoula Parish Schools Demographics and Student Enrollment Figures Show that Catahoula Parish Is a Segregated School District. ...................................... 5

   C.  Recent Revelations Regarding the Persistent Segregation and Conditions of Catahoula Parish Schools. ........................................................................................ 6

III.    THIS COURT SHOULD APPOINT A SPECIAL MASTER PURSUANT TO RULE 53 AND ITS INHERENT POWER. ........................................................................ 7

   A.  This Court has Authority to Appoint a Special Master Under Rule 53 and Its Inherent Powers. .......................................................................................................... 8

   B.  A Special Master Can Be Appointed Because of Non-Compliance with the Court's Orders. ............................................................................................................ 9

IV.    THE DIRE FACTS OF THIS CASE DEMONSTRATE THE NEED FOR A SPECIAL MASTER. ...................................................................................................... 10

   A.  Students at Block High are Receiving a Poor Quality of Education................................ 11

   B.  The Facilities at Block High are Intolerable and Contribute to the Unequal Educational Opportunities........................................................................................ 13

   C.  There are Disparities Along Racial Lines Between Schools in Catahoula Parish. ........... 16

   D.  The Inadequate Responses of the School Board and the DOJ Further Demonstrate that a Special Master Is Necessary...................................................................... 17

V.    THE COURT SHOULD AUTHORIZE THE SPECIAL MASTER WITH THE FOLLOWING DUTIES AND POWERS.................................................................. 20

VI.    FEDERAL FUNDS ARE AVAILABLE TO COMPENSATE A SPECIAL MASTER. . 22

CONCLUSION................................................................................................................ 23

## **TABLE OF AUTHORITIES**

**Cases**             **Page(s)**

*Andrews v. Monroe*,
  513 F. Supp. 375 (W.D. La. 1980)..........................................................20

*Fisher v. Univ. of Tex. at Austin*,
  570 U.S. 297 (2013)...........................................................................4

*Gary W. v. Louisiana*,
  601 F.2d 240 (5th Cir. 1979) ......................................................9, 10, 20

*Hart v. Cmty. Sch. Bd.*,
  383 F. Supp. 699 (E.D.N.Y. 1974) ..............................................................8

*Miller v. Sch. Dist. Number 2*,
  256 F. Supp. 370 (D. S.C. 1966).............................................................22

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
  706 F.2d 956 (2d Cir. 1983), *cert. denied*, 464 U.S. 915 (1983)...............................8

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007)...........................................................................4

*Plessy v. Ferguson*,
  349 U.S. 294 (1995)...........................................................................3

*Reed v. Cleveland Bd. of Educ.*,
  607 F.2d 737 (6th Cir. 1979) .................................................................9

*Reed v. Rhodes*,
  455 F. Supp. 569 (N.D. Ohio 1978)........................................................8, 20

*Ruiz v. Estelle*,
  679 F.2d 1115 (5th Cir. 1982) ................................................................9

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*,
  576 F. Supp. 34 (N.D. Cal. 1983) ..........................................................22

*Sch. Dist. of Pontiac v. Sec'y of the United States Dep't of Educ.*,
  512 F.3d 252 (6th Cir. 2008) .................................................................4

*Smith v. Concordia Par. Sch. Bd.*,
  No. 65-CV-11577, 2017 WL 2508197 (W.D. La. June 8, 2017) ............................2, 8, 10, 20

*Smith v. Sch. Bd. of Concordia Par.*,
  906 F.3d 327 (5th Cir. 2018) ............................................................8, 10

*Stone v. City & County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993)...........................................8

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971)..................................................................................................................7

*United States v. Yonkers Bd. Of Educ.*,
    29 F.3d 40 (2d Cir. 1994)....................................................................................................8

**Statutes**

42 U.S.C. § 2000c-2.....................................................................................................................22

42 U.S.C. § 2000c-4.....................................................................................................................22

Fed. R. Civ. P. 11...........................................................................................................................5

Fed. R. Civ. P. 53.................................................................................................................. *passim*

# INTRODUCTION

In 1969, this Court issued an order requiring the Catahoula Parish School Board ("School Board") to desegregate. The School Board has not complied with that order.  In 2013, the Court ordered counsel for parties to submit a scheduling order within 30 days to govern further progress of the case and the desegregation of schools in Catahoula Parish. Neither party complied with that order, and neither party has addressed the conditions of segregation in Catahoula Parish that continue to create unequal educational opportunities for all students in the school district.  As shown in the recent Now This News report, in the absence of active oversight by either Party, the conditions of segregation and unequal educational opportunity have worsened.[1]  Indeed, late last year, the NAACP received an anonymous letter begging for help given the poor and substandard conditions in certain predominantly black Catahoula Parish schools.   The Louisiana State Conference NAACP ("NAACP") is responding to that call and requests that the Court take the first step toward a solution by appointing a special master to actively oversee and engage the Parties to comply with the Court's orders.

The Court's January 24, 2019 Order (ECF No. 27) was right to suggest that a special master should be considered given the conditions touched upon in the Now This News report video.  However, that seven-minute video could not possibly capture the true extent of the disparate and unequal conditions that exist across schools in Catahoula Parish.  Those disparities indisputably fall along racial lines and, along with student and teacher demographic data, demonstrate that segregation still exists within Catahoula Parish.  As shown below, the execrable conditions in Block High School—a predominantly Black school highlighted in the Now This News video where students must use moldy textbooks, are taught by uncertified teachers, and

---

[1] Now This News, *How Black High School Students are Hurt by Modern-Day Segregation*, YouTube (Jan. 23, 2019), https://youtu.be/od3s3lZWbWM.

have rundown facilities—are far more extensive and worse than previously revealed to this Court.  Testimony from the students of Block High School and their parents show the absence of classroom instruction, unusable or no textbooks, unsanitary restrooms and building conditions, illness linked to subpar classrooms, underachieving academic performance, and the basic lack of educational opportunities that are afforded to other students in Catahoula Parish who attend predominantly white schools.  In short, the adversarial system has failed and more must be, and can be, done.

The facts in this case warrant appointment of a special master to ensure that all children in Catahoula Parish are afforded equal educational opportunities and treatment. As this Court well knows, it has ample power to appoint a special master under Rule 53 of the Federal Rules of Civil Procedure and in exercise of its inherent powers.  Just as in *Smith v. Concordia Par. Sch. Bd.*, No. 65-CV-11577, 2017 WL 2508197 (W.D. La. June 8, 2017), the facts and circumstances here warrant that this Court appoint a special master to oversee the conditions in Catahoula Parish schools.  Further, the Court should give the special master the necessary powers and duties to investigate and assess current conditions in the parish, propose plans for remediation, and oversee compliance with the Court's directives.

## I.     STATEMENT OF INTEREST OF THE AMICUS CURIAE

*Amicus Curiae* the Louisiana State Conference NAACP ("NAACP") is a unit of the nation's oldest civil rights organization, which was established in 1909 to ensure the political, educational, social, and economic equality of rights of all persons, and to eliminate race-based discrimination.  The NAACP has long worked for strong federal enforcement of civil rights in education.  This has included efforts to equalize the salaries and working conditions of Black teachers and principals, as well as efforts to test the proposition that Black schools, under

separate but equal, are, in fact, "equal."  The NAACP's work included challenges to separate but equal in law school and graduate school, which laid the predicate for subsequent successful challenges to the *Plessy v. Ferguson* principle in *Brown v. Board of Education*.  When on May 31, 1955, the *Brown* Court instructed the offending states to desegregate their school systems "at the earliest practicable date" and "with all deliberate speed," 349 U.S. 294, 300-01 (1995), the NAACP took steps to pressure local school boards to make "the earliest practicable date" as soon as possible.  The Louisiana State Conference of the NAACP upholds this mission at the state level and has a particular interest in ensuring that the educational needs of *all* students in Catahoula Parish are met.

The NAACP-led Leadership Conference on Civil Rights, a coalition of civil rights organizations, also spearheaded the drive to win passage of the major civil rights legislation of the era:  the Civil Rights Act of 1957, the Civil Rights Act of 1964, the Voting Rights Act of 1965 and the Fair Housing Act of 1968.[2] More recently, the NAACP has filed amicus briefs in various high-profile education cases concerning issues such as adequate funding, the school-to-prison pipeline, and affirmative action.[3] Additionally, the organization continues to litigate desegregation cases across the nation on behalf of students.[4]

The NAACP also has vast educational policy experience involving the implementation and enforcement of No Child Left Behind ("NCLB") and its successor, the Every Student

---

[2] *See NAACP: A Century in the Fight for Freedom*, Library of Congress, https://www.loc.gov/exhibits/naacp/the-civil-rights-era.html (last visited Feb. 24, 2019).  The current name of the Leadership Conference is The Leadership Conference on Civil and Human Rights. *See* https://civilrights.org.

[3] *See, e.g.*, Brief for NAACP as Amicus Curiae in Support of Respondents, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007);  Brief for National Association for the Advancement of Colored People Texas State Conference of the NAACP in Support of Respondents, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013).

[4] *See, e.g.*, NAACP New Jersey State Conference et al. v. New Jersey (N.J. Sup. Ct. Law Div. May 17, 2018), https://www.northjersey.com/story/news/new-jersey/2018/05/17/lawsuit-claims-nj-schools-racially-segregated/618308002/; Rachel M. Cohen, *St. Louis Public and Charter Schools Fight Over Desegregation Taxes*, The American Prospect (Apr. 27, 2016), https://prospect.org/article/st-louis-public-and-charter-schools-fight-over-desegregation-taxes.

Succeeds Act ("ESSA"), as well as the Elementary and Secondary Education Act Reauthorization ("ESEA").[5] In addition, the organization has provided ESSA and civil rights training to its units and through those units, helped states develop State ESSA Plans.[6]

The NAACP continues to be invested in ensuring all children, regardless of race or circumstance have access to equal educational opportunities.  This interest applies to the students of Catahoula Parish and was heightened when the national office of the NAACP received an anonymous letter dated October 4, 2018, from citizens in Jonesville, Louisiana, complaining about the poor conditions in Block High School and requesting assistance.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Procedural History.

On February 10, 1969, the United States Department of Justice ("DOJ") initiated this lawsuit against the Catahoula Parish School Board ("School Board").  On August 1, 1969, this Court ordered the School Board to effectuate a desegregation plan designed to disestablish the dual school system that existed in the school district, and permanently enjoined the School Board from discriminating on the basis of race or color in the operation of the school system.  ECF No. 1.  Pursuant to the desegregation order, the School Board consolidated various schools within its district in 1970, 1980, 1994, 1995, and 2012.  ECF Nos. 1, 11.

---

[5] *See, e.g., State of Conn., et al. v. Conn. State Conference NAACP, et al.*, 08 2437-CV (2d Cir. 2009)(arguing that the State's understanding of the "unfunded mandates" provision of NCLB imperils not only NCLB but potentially all federal grant-in-aid programs).The Connecticut State Conference NAACP also filed an amicus brief in *Sch. Dist. of Pontiac v. Sec'y of the United States Dep't of Educ.*, 512 F.3d 252, 262 nf.3  (6th Cir. 2008).  In this *en banc* 6th Circuit panel, the NAACP urged the panel to reverse the 3-judge panel decision because it invites states and districts to evade their obligations to poor and minority children.  *See also Elementary and Secondary Education Act Reauthorization Passes the US Senate Today*, NAACP (Dec. 10, 2015), https://www.naacp.org/latest/elementary-and-secondary-education-act-reauthorization-passes-the-us-senate/.

[6] *See, e.g.*, Making the Grade: A Toolkit on the Every Student Succeeds Act,  NAACP (2016), https://www.naacp.org/wp-content/uploads/2016/03/MakingTheGrade.pdf (toolkit published by the NAACP detailing how to access the benefits promised under ESSA).  The NAACP is also currently preparing for its Civil Rights Advocacy Training Institutes ("CRATI"), beginning in March 2019; a CRATI will be held in each of the NAACP's 7 regions.  Each training will include an Education Workshop.  The Association is also preparing for commemorations of the 65th Anniversary of *Brown*.

On July 12, 2013, this Court held a telephonic status conference with counsel for the parties and thereafter issued an order directing counsel to "submit to the Court **within thirty (30) days**, a scheduling order to govern the further progress of this case." *See* ECF No. 20 ("2013 Order") (emphasis in original).  To date, neither party has complied with the 2013 Order.  Since the 2013 Order was issued, the only activity that followed over the next five years was the School Board's filing of annual numerical reports ("Status Reports").  ECF Nos. 21-29.  On January 25, 2019, this Court sua sponte issued an order directing each party to show cause on why it should not be sanctioned under Fed. R. Civ. P. 11 for failure to comply with the 2013 Order and to show cause why a special master should not be appointed to oversee the desegregation process.  ECF No. 27.

### B.  Catahoula Parish Schools Demographics and Student Enrollment Figures Show that Catahoula Parish Is a Segregated School District.

Catahoula Parish currently operates six schools: Central High School (K-12), Harrisonburg High School (K-12), Block High School (8-12), Jonesville Elementary School (PreK-4), Jonesville Junior High School (5-7) (Jonesville Elementary and Junior High are feeder schools for Block High School), and Sicily Island High School (PreK-12).  ECF No. 26 (2018 Status Report).  The current student enrollment in Catahoula Parish is 59.7% white, 38% Black, 1.2% Hispanic, 0.2% Asian, and 0.8% American Indian.  *Id.* The major demographics of the student body and teachers, and the percentage of uncertified teachers at each school are as follows:

| School Name | White Students | Black Students | White Teachers | Black Teachers | Uncertified Teachers |
|---|---|---|---|---|---|
| Central High (K-12) | 92.5% | 7.5% | 100% | 0% | 0% |
| Harrisonburg High (K-12) | 85% | 12.1% | 95% | 5% | 5% |
| Block High (8-12) | 39.5% | 58.4% | 68.75% | 31.25% | 31.25% |
| Jonesville Jr. High (6-7) | 47.4% | 50.9% | 50% | 50% | 20% |
| Jonesville Elementary (K-5) | 50.2% | 48.3% | 87.5% | 12.5% | 12.5% |
| Sicily Island High (K-12) | 47.4% | 49.4% | 71.43% | 28.57% | 4.8% |

*See id.;* ECF 32, Ex. 4.

As these figures reveal, Catahoula Parish schools are to this day largely segregated, with Central and Harrisonburg high schools consisting of a predominantly all white student population, Block high school consisting of a mostly black student population, and its feeder schools (Jonesville Jr. High and Jonesville Elementary) consisting of a higher percentage of Black students than the overall demographics of school district.

### C.     Recent Revelations Regarding the Persistent Segregation and Conditions of Catahoula Parish Schools.

The national office of the NAACP received an anonymous letter dated October 4, 2018, from citizens in Jonesville, Louisiana.  A true and correct copy of the letter is attached hereto as Exhibit E.  The letter describes unequal and inadequate conditions at Block High School, Jonesville Elementary School, and Jonesville Junior High School ("Jonesville schools") compared to the rest of the district and requests that the NAACP "[p]lease investigate and if possible do whatever needs to be done to help."  *Id.*  On January 10, 2019, the NAACP sent a written request to the School Board inquiring what steps were being taken to remedy the conditions in the Jonesville schools.  A true and correct copy of the letter is attached hereto as Exhibit F.  To date, the NAACP has not received any response from the School Board.

As this Court knows, on January 23, 2019, a video news report was published depicting substandard conditions at Block High School.[7]  These conditions include, among others, moldy and unsafe buildings, unusable textbooks, untrained teachers, and unequal funding and disparity in school conditions between Block High School (a school with a majority Black population) and Harrisonburg High School (a school with a majority white population).  Declarations from students attending Block High School and their parents, which are submitted herewith, affirm and elaborate on the conditions highlighted in the Now This News video.  *See infra Section IV.*

On February 9, 2019, former superintendent of Catahoula Parish Schools, Dr. Gwile Freeman, issued a statement on school conditions and student achievement that runs directly contrary to the news video and the testimony of the students who attend Block High School on a daily basis.  In that statement, Dr. Gwile also claimed that "[r]epresentatives of the United States Department of Justice (USDOJ) toured all schools in Catahoula Parish in May 2018 and reported no issues."[8]  Dr. Freeman is no longer the superintendent in Catahoula Parish and an interim superintendent currently holds the position.[9]  As shown below, her statement is without basis.

### III.     THIS COURT SHOULD APPOINT A SPECIAL MASTER PURSUANT TO RULE 53 AND ITS INHERENT POWER.

When faced with school desegregation cases, district courts act in equity and have broad remedial powers:  "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).  One such remedy is the appointment of a special master to oversee the desegregation process. The

---

[7] *How Black High School Students are Hurt by Modern-Day Segregation*, *supra* note 1.
[8] Sharon Cummings, *Catahoula Parish Superintendent Releases Statement on Issues*, MyArkLaMiss (Feb. 6, 2019), https://www.myarklamiss.com/news/local-news/catahoula-parish-superintendent-releases-statement-on-issues/1759429567.
[9] *See Catahoula Superintendent Advertisement*, Catahoula Schools, https://cpsbla.org/ (last visited Feb. 26, 2019).

power to appoint a special master derives from both Rule 53 of the Federal Rules of Civil Procedure and the court's inherent powers.  Courts that have appointed special masters in similar desegregation cases have done so based on non-compliance with a court order and lack of indication that the parties will make progress without special master intervention. These conditions are present in this case, and the Court is well within its authority to appoint a special master.

> **A.     This Court has Authority to Appoint a Special Master Under Rule 53 and Its Inherent Powers.**

Rule 53 of the Federal Rules of Civil Procedure authorizes a court to appoint a special master for a variety of reasons, including post-trial matters.  Specifically, it provides that a court can appoint a special master to address "post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Fed. R. Civ. P. 53(a)(1)(C).  While masters should only be appointed in "limited circumstances" (*see* Fed. R. Civ. P. 53, Advisory Committee Note of 2003), it is well established that special masters are appropriate in school desegregation cases.  *See United States v. Yonkers Bd. Of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) ("The power of the federal courts to appoint special masters is well established."); *Smith v. Concordia Par. Sch. Bd.*, No. 65-CV-11577, 2017 WL 2508197 (W.D. La. June 8, 2017), *aff'd in part*, *vacated in part on other grounds by Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327 (5th Cir. 2018) (special master appointed to oversee charter school's desegregation process); *Hart v. Cmty. Sch. Bd.*, 383 F. Supp. 699, 766 (E.D.N.Y. 1974) ("In the area of school desegregation, experts have been appointed to advise courts in devising remedies."); *Reed v. Rhodes*, 455 F. Supp. 569 (N.D. Ohio 1978) (special master was appointed to conduct a fiscal analysis of the school district and submit recommendations to the court for a desegregation plan); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956,

962–65 (2d Cir. 1983), *cert. denied*, 464 U.S. 915 (1983); *Stone v. City & County of San Francisco*, 968 F.2d 850, 859 n.18 (9th Cir. 1992) (collecting cases), *cert. denied*, 506 U.S. 1081 (1993).

Separate from its powers under Rule 53, this Court also has the inherent power to appoint a special master to ensure that its nearly fifty-year-old desegregation mandate is enforced.  The Fifth Circuit has recognized that a district court has "the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential."  *Ruiz v. Estelle*, 679 F.2d 1115, 1161 n.240 (5th Cir. 1982) (internal quotations omitted).  Courts have considered a special master essential in school desegregation cases due to their complex nature and the competing interests involved. *See Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 743 (6th Cir. 1979) ("In order to accomplish these ends with fairness to all concerned a judge in equity has inherent power to appoint persons from outside the court system for assistance.").

Since the power to appoint a special master is one of equity, the Court in its inherent authority can appoint a special master separate and apart from the requirements of Rule 53.  *See Ruiz*, 679 F.2d at 1161 ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy.").  Given the facts in this case, the Court is well within its power to appoint a special master under either Rule 53 or its inherent powers.

### B.    A Special Master Can Be Appointed Because of Non-Compliance with the Court's Orders.

In similar desegregation cases, courts have appointed special masters based solely on the failure to comply with a prior court order.  In *Gary W. v. Louisiana*, the Fifth Circuit appointed a special master in desegregation case based on continuous noncompliance with a court order, noting "[t]hese proceedings have now been pending for over four years and a significant number

of the children involved still have not been accorded the relief ordered." 601 F.2d 240, 245 (5th Cir. 1979).  The court went on to explain that over the course of two years, the parties failed to comply with the court's original order and "there [was] no indication that, left unsupervised, [the parties] will make better progress." *Gary W.*, 601 F.2d at 244.  The record in this case demonstrates a similar lack of progress since both parties failed to comply with this Court's 2013 Order.  To date, neither party has submitted a scheduling order and both remain noncompliant. This failure alone is sufficient to support a special master's appointment.

On a separate occasion, this Court appointed a special master to oversee a charter school's desegregation because the school was found to be in violation of a district's desegregation order.  *See Smith*, 2017 WL 2508197, at *1 (Drell, J.).  In *Smith*, a charter school opened in a district that was under a desegregation order and enrolled 85% white students.  906 F.3d at 332.  The Fifth Circuit affirmed this Court's finding that the school was drawing "disproportionately white" students from the parish, which ultimately had a "negative impact on the district's ability to desegregate." *Id.* at 333.  Similarly, the facts here warrant appointment of a special master. Catahoula Parish has still not reached unitary status with one school, Central High, that is over 90% white and another, Harrisonburg High, that is 85% white.  Moreover, years of inaction and neglect of Block High School and other Jonesville schools have resulted in unequal conditions in those schools and contributed to the ongoing segregation in the parish.

## IV.  THE DIRE FACTS OF THIS CASE DEMONSTRATE THE NEED FOR A SPECIAL MASTER.

Conditions at Block High School are dismal and reflect years of neglect and lack of meaningful progress towards unitary status.  As demonstrated in the Now This News video, students in the district are attending racially stratified schools and have unequal access to

certified teachers, adequate facilities, resources, and learning opportunities.[10]   However, the video only scratches the surface of the extent of the educational inequalities prevalent in Catahoula Parish.

As shown below, (1) students at Block High are receiving a poor quality of education, (2) the facilities at Block High are intolerable and hazardous to students' health, (3) there are disparities in the educational opportunities that exist along racial lines between schools in Catahoula Parish, and (4) the School Board and the DOJ demonstrate in their responses that there is no meaningful plan in place to resolve the conditions.   A special master is therefore needed to investigate these conditions, recommend to the Court a plan for desegregation, and oversee the implementation of that plan.

### A.   Students at Block High are Receiving a Poor Quality of Education.

Students at Block High School are often receiving instruction from inexperienced, uncertified teachers who lack the proper training and background to teach the subject matter. As a result, students frequently must learn online via supplementary programs and without proper assistance or guidance. *See* D.L. Decl. Ex. C; T.B. Decl. Ex. A; I.B. Decl. Ex. B; Cynthia Barber Decl. Ex. D; ECF 32, Ex.4.  Students also lack the necessary resources (textbooks, science labs) to receive a quality education. These conditions are best explained by the students themselves, one of whom states in no uncertain terms, "I am [not] getting a quality education at Block High School."  *See* I.B. Decl. B.

For instance, students describe their education and lack of proper instruction from certified teachers as follows:

---

[10] *How Black High School Students are Hurt by Modern-Day Segregation*, *supra* note 1.

> Most of what I learn is on the computer and I cannot confirm
> whether I am actually learning. Many of my teachers are unable to
> tell me if I am doing my work correctly since they are either
> substitutes or fresh out of college. For instance, my Spanish
> teacher did not know any Spanish.

I.B. Decl. Ex. B.

Even in those classes with certified teachers the instruction is still lacking because the

learning resources and materials are inadequate, and discourage students from wanting to learn:

> Block High is not preparing me for life after graduation. . . . In
> History, the school hired a teacher this week to teach the class, but
> we do not have enough textbooks. Students have to share
> textbooks because many of the books have mold in them. Some
> students instead choose to use a moldy textbook because they want
> to work independently. Prior to this teacher arriving, we did not
> use textbooks at all and just did online learning since an athletic
> coach was teaching the class.

T.B. Decl. Ex. A.

The lack of certified teachers and quality curriculum at Block bears out in the

underachieving academics of its students, who struggle because of the lack of educational

opportunities:

> In order to graduate, my daughter must pass the Biology or U.S.
> History test that is required by the state. My daughter has taken
> each test three times and failed. Block High School does not have a
> certified Biology or U.S. History teacher to actually teach and
> prepare the students for what is on the tests.

Cynthia Barber Decl. Ex. D.

Consistent with this testimony, it was not until March 4, 2019, after the Court issued its

recent order, before the School Board finally hired a new teacher[11] to teach U.S. History,

Physics, and English to relieve the athletic coach who had been teaching those classes.  *See* D.L.

Decl. Ex. C; T.B. Decl. Ex. A; I.B. Decl. Ex. B.  Even with this new history teacher, students are

---

[11] It is unclear whether this teacher holds a certification in all of these subjects.

still forced to share textbooks since many of the history books are falling apart or contaminated with mold. *Id.*

The testimony of the students and their parents further bears out in the underlying data from the School Board.  That data show that Block High School students are suffering disproportionately and unfairly compared to students in other, predominately white schools within the school district.  For instance, 31.25% of teachers at Block High School are uncertified, the highest of any other school in the district (ECF 32, Ex. 4), and only 13.47% have bachelor's degrees—the lowest percentage in the school district.[12]  In 2018, only 9% of Block High students were proficient in math.[13]  And, as the DOJ and the School Board admit, "Block High and Jonesville Jr. High consistently experience higher annual teacher vacancies than other schools in the District" (ECF 33 at 5) and "Jonesville schools . . . have the highest percentages of uncertified teachers" (ECF 32 at 4 n.7).

**B.    The Facilities at Block High are Intolerable and Contribute to the Unequal Educational Opportunities.**

The conditions at Block High School are, in the words of one student, "a disappointment." D.L. Decl. Ex. C.  These conditions include "run down" desks and chairs, "urinals that leak when flushed," "pipes in the bathroom [that] leak," "horrible smell[s]," "cracked doors, stained carpets, and broken air conditioners in the hallway," and textbooks that "have mold in them."  *See* I.B. Decl. Ex. B; D.L. Decl. Ex. C; T.B. Decl. Ex. A. One building is inoperable due to black mold that was causing students to become sick and floors on the second level that are rotted and sink in when students walked on them.  *Id.*  While the DOJ claims that "[a]ll schools serving grades 6-12 contain science labs," (ECF 33 at 8) that is incorrect.  The

---

[12] *See School-By-School Financial Data*, Louisiana Believes Dept. of Educ., http://www.louisianabelieves.com/data/310/ (last visited Mar. 9, 2019).
[13] *See Block High School*, GreatSchools.org, https://www.greatschools.org/louisiana/jonesville/304-Block-High-School/ (last visited Feb. 24, 2019).

closed-down building at Block contains the only science lab at the school, meaning students do not have access to a science lab.  *Id.*  Currently, all students in grades 8-12 are forced to take classes in one hallway of one building resulting in overcrowding.  *Id.* The School Board also has not addressed terrible odors emulating from some of the classrooms that keep students away from even wanting to learn.  *Id.*

The conditions are also particularly reprehensible in the one restroom available to female students. That bathroom has only three stalls. Each of the doors on its stalls has large cracks, providing no sense of privacy. *Id.* The lack of privacy contributes to students forgoing classroom opportunities.  For instance, female students at times call home when they are menstruating to get permission to leave school and go home in order to have privacy, missing class in the process. *Id.*

These conditions have led to an increasing number of student transfers from Block High to Harrisonburg and Central.  These transfers have contributed to the segregation in Catahoula Parish since almost all of the students transferring out of Jonesville schools have been white. Between 2011 and 2018, Block High School has seen its white population decline from 52% to 39.5%.  *Compare* ECF No. 9 (2011 Status Report), *with* ECF No. 26 (2018 Status Report).  In fact, over the past three years, the school district has seen a 78% increase in the amount of white students transferring to Harrisonburg High from the Jonesville schools (Block High School, Jonesville Junior High, and Jonesville Elementary) than from 2008-2015.  *Compare* ECF Nos. 2, 7-9, 11, 21-23 (2008-2015 Status Reports), *with* ECF Nos. 24-26 (2016-2018 Status

Reports).[14]  These transfers were all made for "health" reasons and make sense when considering the drastic differences between Block and schools like Harrisonburg and Central.

Additionally, there is indication that student transfers may not have been available on an equal basis in Catahoula Parish.  One student attempted to transfer from Jonesville Junior High to Harrisonburg High when she was in the seventh grade.  *See* T.B. Decl. Ex. A; Cynthia Barber Decl. Ex. D.  A mere two weeks after arriving at the school, the principal at Harrisonburg removed this student from class, called her mother, and told her that she could not attend that school due to her Jonesville address. *Id.*  A special master should be appointed to examine the student transfer policy in the district and ensure that it is fairly implemented.

The conditions are so poor at Block High School and the other Jonesville schools, that on October 4, 2018, a mere five months after the DOJ site visit, the national office of the NAACP received an anonymous letter from citizens in Jonesville describing dismal and unequal conditions at Block High School:

> Block High School has become something terrible. The desks have been here since the school opened. . . . The books that we do have are falling apart and have ripped pages & no one is finding replacements. In one of my classes we have 15 books for 40 students to share. . . . The carpets are MOLDY from the air conditions leaking water on the floor and nothings been done. . . . We have 8th and 12th grade in ONE HALL, we are crowded and stuffed in these little & nasty classrooms. . . . **Nobody cares about Block anymore**.

Exhibit E (emphasis added).

The letter also requests that the NAACP "[p]lease investigate and if possible do whatever needs to be done to help." *Id.*  The fact that affected individuals are seeking help from an outside organization, like the NAACP, demonstrates that the parties have not been adequately addressing

---

[14] Between 2008 and 2015, 26 total white students voluntarily transferred from a Jonesville school to Harrisonburg for "health" reasons, at an average of 3.25 students per year.  Between 2016 and 2018, 45 white students transferred for "health" reasons at an average of 15 students per year, an increase of 78%.

the issues and there will only continue to be delay without special master intervention.  This was confirmed when the NAACP sent a written request to the School Board, inquiring what was being done to remedy the inadequate resources in Jonesville, and received no response.  *See* Ex. F.

      **C.**      **There are Disparities Along Racial Lines Between Schools in Catahoula Parish.**

      Harrisonburg High is a mere fifteen minutes from Block, but there are stark differences in student demographics, facilities, and quality of education. 85% of the student body at Harrisonburg is white, despite the fact that white students make up less than 60% of the student population in the district. ECF No. 26 (2018 Status Report).  Harrisonburg employs only one Black teacher. *Id.*  Central is even more racially stratified than Harrisonburg with a student body population that is 92.5% white.  *Id.*  Central employs no Black teachers and all of Central's teachers are certified.  *Id.*  Harrisonburg's buildings are "a lot cleaner," has "textbooks that [are] newer and [do] not have mold on them," and it is a "well-functioning school" compared to Block High School.[15]   The DOJ admits that Harrisonburg High "exhibits higher quality physical conditions" than all other schools in Catahoula Parish (ECF 33 at 7).  Moreover, only 2.5% of teachers at Harrisonburg have less than a bachelor's degree compared to 13.47% at Block High.[16]   Additionally, only 5% of teachers are uncertified at Harrisonburg unlike the 31.25% of uncertified teachers at Block. (*See* ECF 32, Ex. 4).  It is therefore unsurprising that students

---

[15] *See* T.B. Decl. Ex. A; Cynthia Barber Decl. Ex. D.  *See also How Black High School Students are Hurt by Modern-Day Segregation*, *supra* note 1.
[16] *See School-By-School Financial Data*, Louisiana Believes Dept. of Educ., http://www.louisianabelieves.com/data/310/ (last visited Mar. 9, 2019).

perform better at Harrisonburg with 33% of students proficient in math compared to the 9% at Block.[17]

**D.     The Inadequate Responses of the School Board and the DOJ Further Demonstrate that a Special Master Is Necessary.**

Rather than address the situation at hand, the School Board and DOJ have claimed that conditions are satisfactory at Block High.  For example, on February 5, 2019, the School Board's former Superintendent issued a press release claiming that "[r]epresentatives of the United States Department of Justice (USDOJ) toured all schools in Catahoula Parish in May 2018 and reported no issues with the facilities of Block High."[18]  However, the School Board admitted to its constituents at an October 2018 school board meeting that it had been negligent in overseeing the Jonesville schools.  During that meeting, one parent posed the following question to the School Board:

> I want you all to picture your child in these classrooms. . . . Picture your child looking at a floor that looks like you wouldn't have in your dog pen. . . . Picture your child in a room that a water pipe busted a year ago and the tiles are still the same way and the floors are still the same way. . . . How did we get here?[19]

Members from the school board answered, "we didn't know the situation was like that," since board members from Sicily Island and Harrisonburg "focus more" on those schools.[20] Moreover, the school board admitted that it was directly responsible for the lack of certified teachers at Block by failing to address the conditions at the school.  One member remarked that

---

[17] *Compare Harrisonburg High School*, GreatSchools.org, https://www.greatschools.org/louisiana/harrisonburg/307-Harrisonburg-High-School/ (last visited Feb. 24, 2019), *with Block High School*, GreatSchools.org, https://www.greatschools.org/louisiana/jonesville/304-Block-High-School/ (last visited Feb. 24, 2019).

[18] Sharon Cummings, *Catahoula Parish Superintendent Releases Statement on Issues*, MyArkLaMiss (Feb. 6, 2019), https://www.myarklamiss.com/news/local-news/catahoula-parish-superintendent-releases-statement-on-issues/1759429567.

[19] Catahoula Parish News Booster, *Catahoula Parish School Board Meeting 10/02/18,* Facebook (Oct. 2, 2018), https://www.facebook.com/catahoulanewsbooster/videos/1695055173955128/ (on file with the author).

[20] *Id.*

there have been "certified teachers who wanted to come to Block but when they saw the situation they changed their mind."[21]

The School Board is well aware of the teacher shortage in Jonesville, admitting that four certified teachers left Block High School immediately prior to the 2018-2019 school year and that schools in Jonesville "have the highest percentages of uncertified teachers" (*See* ECF 32 at 4). The School Board claims that the teacher shortage at Block is due to the district's lack of funds, but that explanation does not account for the *discrepancy* between the percentage of uncertified teachers at its majority-white schools (5% uncertified at Harrisonburg and 0% uncertified at Central), compared to the Jonesville schools (31.25% uncertified at Block, 20% uncertified at Jonesville Junior High, and 12.5% uncertified at Jonesville Elementary). *Id.* While the School Board blames the town of Jonesville for failing to increase local taxes to fund their schools (*see* ECF 32 at 7), it is ultimately the School Board's responsibility to ensure the desegregation order is complied with and that all schools in the parish obtain and retain certified teachers. The School Board has the power to allocate funds to each school and should adjust accordingly if poorer towns are unable to raise the same capital for their schools as others. The School Board has not done so, allowing the discrepancy in certified teachers to remain.[22]

Instead, the School Board is seemingly content with the lack of certified teachers, claiming that "[t]he fact that a teacher is not 'certified' does not mean that teacher is not 'qualified,'" (ECF 32 at 4). The facts show however that students are suffering without certified teachers in the classroom. *See supra* Section IV.A. While the School Board proposes seeking a

---

[21] *Id.*

[22] The School Board claims that the district spends "substantially more money on instructional expenses" on the Jonesville schools, but these instructional expenses do not reflect salary-related expenditures. *See* ECF 32, Ex. 6. Since long-term substitutes and other non-certified individuals are not salary employees, it makes sense that the Board spends more in Jonesville for non-salary related expenditures, since the Jonesville schools have overwhelmingly more uncertified teachers. *See id.* at Ex. 4.

Central Louisiana Instructional Program Grant ("CLIP") to hire students fresh out of college to teach (*see* ECF 32 at 5), this program will not remedy the unequal availability of experienced, certified teachers in the school district.

The School Board's proposed consolidation plan is also problematic.  The School Board intends to file, and the DOJ does not oppose, a motion seeking to consolidate Jonesville Junior High and Jonesville Elementary and send the sixth and seventh graders to Block High School to purportedly increase the number of certified teachers at the school (*See* ECF 32 at 5-6).  This is far from a solution.  As shown, Block High School does not have adequate facilities, desks, textbooks, or resources to support the students it already has, let alone an influx of new students. *See* I.B. Decl. B; T.B. Decl. A; D.L. Decl. C.  A community member described the plan as "only adding fuel to the fire."[23]  Further, while the School Board claims that it has completed substantial renovations to Block High School (ECF 32 at 7-9) and has hired teachers, these changes only occurred *after* students protested late last year.  Conditions have been deteriorating at Block for years without change. *See* T.B. Decl. Ex. A; D.L. Decl. Ex. C; I.B. Decl. Ex. B.

The School Board's last minute attempts to remedy problems that have been ongoing for years demonstrates that the parties will only take steps towards compliance if there is public pressure and threat of judicial oversight.  The School Board claims "the complaints of citizens, parents, and students of Block High School have not been ignored" (ECF 32 at 8), yet at the same time also alleges "complaints about Block High School have been made as part of the continuing efforts of a handful of individuals to place the school in a negative light for the purposes of their personal agendas" (*Id.* at 6).  The only personal agenda these students have is obtaining a decent education.  The School Board goes on to state that "[t]he parties who now

---

[23] Catahoula Parish News Booster, *Catahoula Parish School Board Meeting 10/02/18,* Facebook (Oct. 2, 2018), https://www.facebook.com/catahoulanewsbooster/videos/1695055173955128/ (on file with the author).

complain about Block High School also offer no suggestions as to how the cost of additional renovations and/or repairs to that school can be financed," (ECF 32 at 8), but these are exactly the type of issues a special master would be well positioned to help the district address.  Even if seeking a CLIP or school consolidation are solutions, the track record of conditions in the district establish that a special master is needed to ensure meaningful change is not just proposed, but pursued and achieved.  Before such measures are taken, a special master should take an in-depth analysis of the Catahoula Parish school system and come up with a plan that is best suited for *all* students.  A special master is therefore necessary to ensure that real progress is made and that the School Board will not revert to business as usual when the Court is not looking.

## V.     THE COURT SHOULD AUTHORIZE THE SPECIAL MASTER WITH THE FOLLOWING DUTIES AND POWERS.

While it is important to appoint a special master to ensure the desegregation mandate is complied with, it is just as important that this Court grant the special master the powers required to devise adequate remedies.  Authorizing a special master to take the steps necessary to assess compliance with the Court's order does not usurp the Court's function since the Court "retains the authority to reject or modify any recommendation by the Master . . . ."  *Gary W.*, 601 F.2d at 245.  Here, the Court should grant the special master the power to consult with the School Board, community groups, civic organizations like the NAACP, and others to ensure that the new desegregation plan meets the needs of all students.  *See Andrews v. Monroe*, 513 F. Supp. 375, 395 (W.D. La. 1980) (special master was "authorized to collect evidence, to conduct formal and informal hearings, to consult with federal, state and local public officials, to consult with community groups, civic organizations, and others, and to subpoena witnesses and records.").  A special master needs to have "complete and unrestricted access" to the school records and data

needed to fulfill his duties.  *Reed*, 455 F. Supp. at 609.  The special master should then submit nonbinding reports and recommendations to this Court for final approval.  *Id.*

In *Smith v. Concordia Parish*, this Court ruled that a special master should be appointed to oversee the school's desegregation plan and ensure the creation of a minority student recruitment plan, the submission of quarterly reports on the status of compliance, the elimination of disparate treatment regarding student discipline, participation in extra-curricular activities, and transportation services, and the recruitment and retention of minority teachers and administrators.  *See Smith*, 2017 WL 2508197, at *5.  The NAACP proposes that the Court follow the same approach here as it did in *Smith*.  In addition, the NAACP recommends the court empower the special master to investigate and propose a plan to address the following issues:

- **Resources and Facilities.**  Whether Block High School and other Jonesville schools have the resources and facilities necessary to provide students with an equal educational opportunity and a safe place to learn. The special master should investigate and determine the best course of action to remedy the harmful conditions in Jonesville schools.

- **Teacher Certifications.**  Whether all students in Catahoula Parish have equal access to certified, experienced teachers. The special master should investigate and propose a plan to ensure teachers are assigned to schools in the district in a way that is equitable for all students.  The School Board should be required to report on each teacher's certification status and which classes he or she teaches as part of its annual status reports to the Court.

- **Funding.**  Whether school district funds are dispersed on an equitable basis.  The special master should receive annual financial reports detailing funding.

- **Academic Achievement.**  Whether each school in the district provides a curriculum giving all students the same access to higher-level courses. Online resources should be *supplemental* to a student's learning and not take the place of primary classroom instruction. The special master should ensure each school in the district is providing its students with quality classroom instruction. The special master should also be provided with the annual academic results of students on a schoolwide basis.

- **Student Demographics.**  The special master should investigate current student demographics and trends and propose a plan that ensures that the schools in Catahoula Parish are desegregated.  Voluntary transfers should only be permitted if they promote desegregation and should be implemented on an equal basis.

- **Faculty Demographics.**   Black teachers make up only 5% of the teaching staff at Harrisonburg and there are no Black teachers at Central High.  For at least the past ten years, there has not been a Black principal at any of the schools in Catahoula Parish. The special master should help the School Board develop a plan to desegregate the faculty at each of its schools.

Remedying existing segregation may require schools like Central and Harrisonburg to open their doors to students from other towns and share the resources that have been concentrated within these schools for all these years.   While parents or students from Harrisonburg and Central may have concerns about the process, those concerns do not outweigh the greater concern of remedying segregation.  *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 576 F. Supp. 34, 49 (N.D. Cal. 1983) ("The Court understands that the children at Drew School and Pelton School to some extent are being asked to make sacrifices, but it believes that the changes mandated by the Decree ultimately will redound to their benefit, as well as to the collective benefit of every child in San Francisco.").

## VI.    FEDERAL FUNDS ARE AVAILABLE TO COMPENSATE A SPECIAL MASTER.

 The School Board has the option to apply for federal funds to compensate a special master, should one be appointed.  Title IV of the Civil Rights Act provides that school boards are authorized to apply for technical assistance from the federal Department of Education in order to comply with a desegregation order.  Title IV provides:

> "The Commissioner [Secretary] is authorized, upon the application of any school board, State, municipality, school district, or other governmental unit legally responsible for operating a public school or schools, to render technical assistance to such applicant in the preparation, adoption, and implementation of plans for the desegregation of public schools. Such technical assistance may, among other activities, include making available to such agencies information regarding effective methods of coping with special educational problems occasioned by desegregation, and making available to such agencies personnel of the Office of Education [Department of Education] or other persons specially equipped to advise and assist them in coping with such problems."

42 U.S.C. § 2000c-2.

The Secretary of Education is "authorized, upon application of a school board, to make grants to such board to pay, in whole or in part, the costs of employing specialists to advise in problems incident to desegregation." *Id.* at § 2000c-4(a) and (a)(2). *See, e.g.*, *Miller v. Sch. Dist. Number 2*, 256 F. Supp. 370, 377 (D. S.C. 1966) ("The court is mindful that such programs may be an added expense. Without prescribing any method of financing, the court calls attention to the privileges assured in this field by the provisions of Title IV of the Civil Rights Act of 1964."). Financial considerations should not deter this Court from appointing a special master.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should appoint a special master to ensure the Catahoula Parish School Board complies with the desegregation mandate. The Court should grant the special master full powers necessary to propose a desegregation plan that addresses the racially stratified schools within Catahoula Parish as well as disparities between those schools regarding resources and facilities, certified teachers, curriculum and classroom instruction, voluntary transfers, and funding.

Respectfully submitted,

LOUISIANA STATE CONFERENCE NAACP


By its attorneys


___*s/ Louis G. Scott* _____

LOUIS G. SCOTT
LAW OFFICE OF LOUIS G. SCOTT
510 Pine St.
Monroe, LA 71201
(318) 323-6107
grand97scott@aol.com

W. KYLE TAYMAN
JESSICA RABINOWITZ
VIONA J. MILLER
GOODWIN PROCTER LLP
901 New York Avenue
Washington, D.C. 20001
(202) 346-4000
ktayman@goodwinlaw.com
jrabinowitz@goodwinlaw.com
vmiller@goodwinlaw.com
*Pro hac vice applications pending*


Dated: March 15, 2019